UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60888-CIV-ALTMAN/Hunt

**RONY Y. JEAN BAPTISTE**,

    *Plaintiff,*

v.

**SECURIAN FINANCIAL GROUP, INC.**, *et al.*,

    *Defendants.*

_____/

## ORDER

    The Plaintiff, Rony Y. Jean Baptiste, is the beneficiary of his brother's life and accidental death

and dismemberment insurance plans. After Jean Baptiste's brother died of a drug overdose, the

insurer—Securian Life Insurance Company—paid Jean Baptiste the life insurance benefits. But it

denied coverage for the accidental death benefits. In doing so, it notified Jean Baptiste that his

brother's death was not a covered loss and that the overdose was otherwise excluded from coverage

under certain plan provisions. As we explain below, this denial of accidental death benefits was neither

arbitrary nor capricious—which means that, under the Employee Retirement Income Security Act of

1974 ("ERISA"), we cannot disturb Securian Life's decision. We therefore **GRANT** Securian Life's

Motion for Summary Judgment (the "Motion") [ECF No. 30].

### BACKGROUND[1]

**I.    THE POLICIES**

    Securian Life issued a group life insurance policy and a group accidental death and

dismemberment ("AD&D") policy to Johns Hopkins University. *See* Joint SOMF ¶ 1. We refer to

---

[1] The following facts are taken from the Parties' Joint Statement of Undisputed Facts ("Joint SOMF")
[ECF No. 31], Securian Life's Statement of Facts ("Def.'s SOMF") [ECF No. 29], and the exhibits
Securian Life appended to its SOMF. Because the Plaintiff didn't file a response to Securian Life's
statement of facts, *see generally* Docket—which Securian Life properly supported with documentary
evidence—we deem those facts admitted, *see* S.D. FLA. L.R. 56.1(c) ("All material facts in any party's

these as the "Policies," collectively, or as "Policy 70327" and "Policy 70328," respectively.[2] The former offers both life insurance and voluntary AD&D coverage, while the latter offers only AD&D coverage. *Id.* Ramses P. Mocombe, the Plaintiff's brother, was employed as a nurse anesthetist at Johns Hopkins and had enrolled in both Policies. *Id.* ¶ 2.

This case concerns only the AD&D benefits. Under the Policies, AD&D coverage is "limited," such that an insured is entitled to benefits "only when [his] loss, death or dismemberment, results, directly and independently from all other causes, from an accidental bodily injury which was unintended, unexpected and unforeseen." *Id.* ¶ 3. Furthermore, "[t]he bodily injury must be evidenced by a visible contusion or wound, except in the case of accidental drowning. The bodily injury must be the sole cause of [the insured's] death or dismemberment." *Id.*

Policy 70327 includes the following exclusion, which provides (in relevant part) that Securian Life isn't required to pay AD&D benefits when an insured's death:

> is caused directly or indirectly by, results in whole or in part from or during, or there is contribution from […] (3) [the insured's] participation in, or attempt to commit, a crime, assault, felony, or any illegal activity, regardless of any legal proceedings thereto; […] (5) the use of alcohol; or (6) the use of prescription drugs, non-prescription drugs, illegal drugs, medications, poisons, gases, fumes, or other substances taken, absorbed, inhaled, ingested or injected.

*Id.* ¶ 4. Similarly, Policy 70328 doesn't require Securian Life to pay out benefits when an insured's death:

> is caused directly or indirectly by, results in whole or in part from or during, or there is contribution from […] (3) the insured's commission of, or attempt to commit a felony, or to which a contributing cause was [the insured's] being engaged in an illegal

---

Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under FED. R. CIV. P. 56 does not apply."); *cf. Ligotti v. United Healthcare Servs., Inc.*, 2021 WL 2333111, at *16 (S.D. Fla. June 8, 2021) (Altman, J.) (deeming material facts admitted when the opposing party's disputations were "procedurally improper").

[2] The Policies are attached as exhibits to the Def's SOMF. *See* Policy 70327 [ECF No. 29-2]; Policy 70328 [ECF No. 29-3].

occupation; [...] [or] (5) a loss to which a contributing cause was the insured's being intoxicated or under the influence of any narcotic.

*Id.* ¶ 5. Both Policies confer discretionary authority on Securian Life by providing that "Securian Life has the exclusive right and authority, in its sole discretion to interpret the group policy and decide all matters arising thereunder. Securian Life's exercise of that authority shall be conclusive and binding on all persons unless it can be shown that the determination was arbitrary and capricious." *Id.* ¶ 6.

## II.    MR. MOCOMBE'S DEATH

On April 14, 2018 (while the Policies were in effect), Baltimore police officers found Mr. Mocombe dead in his apartment. *Id.* ¶ 7. According to the Incident Report, the officers found him "sitting on the bed slumped over on his right side with his face into the mattress." *Id.* He had an IV inserted in his hand, and vials of medications[3] were scattered throughout his apartment. *Id.*

Maryland's Medical Examiner performed an autopsy. *Id.* ¶ 9. The autopsy report noted that there had been an "intravenous line taped to the back of the left hand" of the decedent and that "[t]here was no evidence of significant recent injury." *Id.* ¶ 10. The examiner opined that the decedent had self-administered substances intravenously and that he had ultimately died of "Diphenhydramine, Ketamine and Ethanol Intoxication with Fentanyl Use." *Id.* ¶¶ 11–12. Still, the "manner of death [was] best certified as COULD NOT BE DETERMINED." *Id.* The Medical Examiner later amended the report, maintaining her opinion that the decedent "died of Diphenhydramine, Ketamine and Ethanol Intoxication with Fentanyl Use," but adding that, "[p]er report, the Decedent had insomnia which he had been self-treating for years. No history of depression, suicidal ideations or prior suicide attempts was reported. The manner of death is ACCIDENT." *Id.* ¶ 13. She also prepared a Toxicology Report, which revealed traces of "diphenhydramine, ketamine, lidocaine, metroprolol, metroclopramide, and

---

[3] Those included: "2-Azithromycin, 1-Xylocaine, 1-Solv Cortef, 13-Diphenhydramine, 1-Metoclopramide Inj 10mg/2ml, 10-Metoprolol Inj 5ml, 3-Ketorolac Tromethamine30 mg, 1-Midazolam Inj. 5mg, 3-Lidocane Inj 1000mg, 4-Fentanyl Citrate Inj. 100mcg/2ml, 3-Ondansetron 4mg/2ml, 1-lactated Ringer's Dextrose Inj." Joint SOMF ¶ 7.

fentanyl in the Decedent's urine." *Id.* ¶ 14. Finally, the Toxicology Report included the results of a subclavian blood test, which showed 1.8 mg/L of diphenhydramine and 2.1 mg/L of ketamine in the decedent's system and a blood-alcohol level of .17%. *Id.*

The State of Maryland issued a Certificate of Death on May 9, 2018, listing the "direct[ ] cause of death" as diphenhydramine, ketamine, and ethanol intoxication with fentanyl use and indicating that the "injury occurred" because of drug use. *Id.* ¶ 15. A July 13, 2018 amendment to the Certificate of Death declared that the manner of death was an "accident." But that amendment reiterated that "drug use" had caused the death. *Id.* ¶ 16. Specifically, it concluded that diphenhydramine, ketamine, ethanol, and fentanyl had "directly caused" the death. *Id.*

### III.   THE PLAINTIFF'S CLAIM FOR BENEFITS

The Plaintiff submitted a claim for benefits on behalf of himself and Viotti A. Lefevre, the decedent's other brother. *Id.* ¶ 17. He contended that the decedent "passed away due to an accidental overdose of powerful sedatives, in his quest to combat debilitating insomnia." *Id.* ¶ 18. He appended to his claim copies of the Certificate of Death, the Incident Report, the Toxicology Report, and the Medical Examiner's Report. *Id.* Securian Life informed the Plaintiff that the brothers were entitled to life insurance benefits under Policy Number 70327, *id.* ¶ 19, but it denied their claim for AD&D benefits under both Policy 70327 and Policy 70328, *id.* ¶ 20. Securian Life explained that, "based on the information available to [it], the manner of death could not be determined, and no proof of accidental death as defined in this policy has been provided." Def.'s SOMF ¶ 21. Even if the death had been "accidental," Securian Life continued, "there [were] specific exclusions for this type of event"—namely, for losses "caused, resulting from, or contributed to by alcohol, prescription, nonprescription, and illegal drugs, medications, intoxication, and/or narcotics." *Id.*

The Plaintiff appealed the decision to Securian Life and advanced two arguments: (1) that Securian Life didn't have the benefit of the final Certificate of Death, the Toxicology Report, or the

Medical Examiner's Report when it first reviewed the claim, and (2) that Securian Life misinterpreted or incorrectly applied the term "narcotic" as it appears in the policy exclusions. *See* Joint SOMF ¶¶ 21–22.[4] The Plaintiff didn't, however, dispute Securian Life's position that the decedent had died from a drug overdose. *Id.* To the contrary, he conceded that the decedent "accidentally succumbed to a therapeutic use of medications"—though he added (without evidence) that the decedent was "legally qualified to prescribe and administer" the drugs and that he'd been self-prescribing those drugs "for several years to help combat Insomnia." Aug. 13, 2018 Letter [ECF No. 29-13] at 3; *see also id.* (noting that the "[d]eath was caused by an accidental overdoes [*sic*] of a sleeping cocktail that [the decedent] had been prescribing to himself for years").

In reviewing the appeal, Securian Life reached out to Johns Hopkins, which represented that Mr. Mocombe *wasn't* permitted to write prescriptions and that he *hadn't* filled any prescriptions on his own behalf at any Johns Hopkins facility between April 14, 2017 and April 14, 2018. *See* Joint SOMF ¶ 23. Securian Life also ran a "ScriptCheck," which indicated that, between September 21, 2007 and April 3, 2018, Mr. Mocombe *hadn't* been prescribed any of the medications that were found in his home—other than one drug, Azithromycin—or any of the drugs found in his system. *Id.* ¶ 24. Securian Life then upheld its denial of AD&D benefits, informing the Plaintiff of this decision by letter dated December 12, 2018. *Id.* ¶ 25.

In that letter, Securian Life explained that Mr. Mocombe's death "was not the result of an accidental bodily injury" (as defined by the Policies) because (1) there wasn't any evidence of a visible contusion or wound and (2) injury or death was a foreseeable result of the high concentration of drugs and alcohol in the decedent's system. *See* Def.'s SOMF ¶ 26; *see also id.* (determining that "[t]he combination of ketamine, elevated levels of diphenhydramine, and an elevated ethanol level, more

---

[4] Mr. Lefevre didn't appeal, and the Plaintiff didn't file an appeal on his behalf. *Id.*

than likely led to significant central nervous depression, pulmonary dysfunction, hemodynamic instability, and death"). Securian Life further noted that, according to medical literature, the decedent's blood-alcohol level of .17% was just below the fatal range and that its Associate Medical Director was of the view that ketamine (a general anesthetic) is a dangerous drug that should be administered *only* in a hospital setting under the care of a medical professional. *Id.* ¶¶ 27–28. Finally, Securian Life invoked the Policies' crime and felony exclusions and emphasized that Mr. Mocombe's death was caused by the possession of controlled substances and unprescribed medications, in violation of Maryland law. *Id.* ¶ 29.

The Plaintiff filed a second appeal—arguing again that the term "narcotic" in Policy 70328 was ambiguous. *See* Joint SOMF ¶ 26. After some additional review, Securian Life reaffirmed its denial of AD&D benefits. *Id.* ¶ 27.

### IV.    PROCEDURAL HISTORY AND MOTION FOR SUMMARY JUDGMENT

One year after Securian Life denied his second appeal, the Plaintiff filed this lawsuit. *See* Complaint [ECF No. 1]. In it, he claims that Securian Life[5] breached its contract by failing to pay out $673,000 in AD&D benefits under the Policies. *Id.* at 5.

After some protracted litigation, Securian Life filed its Motion for Summary Judgment, in which it advanced two arguments. *First*, it said that Mr. Mocombe's death was not a covered loss. *See* Motion at 8–11. *Second*, it contended that it had carried its burden of showing that Mr. Mocombe's death fell within either of the two kinds of policy exclusions—the alcohol-and-narcotics exclusions and/or the crime-and-felony exclusions. *Id.* at 11–14. Securian Life also pointed out that the Plaintiff failed to join Mr. Lefevre to the lawsuit. *Id.* at 15–16. And, Securian Life said, Mr. Lefevre is an indispensable party whose absence entitles the insurer to summary judgment. *Id.*

---

[5] The Plaintiff also named Securian Financial as a Defendant. But, as we explain below, Securian Financial isn't a proper party to this lawsuit.

The Plaintiff filed a Response [ECF No. 32],[6] in which he repeated the argument he had made in his administrative appeal—that the term "narcotic" in Policy 70328 is ambiguous as to whether it encompasses prescription medications or "illicit street drugs," *id.* at 4. He also claimed that, even though the decedent's toxicology test was "conducted by a very competent physician," the physician had "no way of knowing that her findings would become the linchpin in a future insurance claim dispute," and he speculated that—had she known—she would have conducted a "UAC/BAC ratio test." *Id.* at 5. Finally, he complained that the record *in this case* had "not developed" because (he said) he hadn't had the "opportunity to question the individual(s) who drafted the ambiguous language" or the "doctor who performed the postmortem." *Id.* at 6. Beyond that, the Plaintiff didn't address any of Securian Life's arguments. *See generally id.*

## STANDARD OF REVIEW IN ERISA CASES

Generally, in federal civil cases, summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In an ERISA case, however, the district court "sits more as an appellate tribunal"; it "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat. Servs., Inc.*, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002)). Thus, even if there are unresolved factual

---

[6] Securian Life filed its Motion on February 3, 3021, and the Plaintiff filed his Response more than two weeks later, on March 1, 2021. *See* Response. But the Plaintiff never moved for an extension of time. *See generally* Docket. Under the local rules, that would allow us to strike the Response and entitle us to treat the Motion as unopposed. *See* S.D. FLA. 7.1(c)(1). At the same time, "although *pro se* litigants are still bound by rules of procedure, . . . they should not be held to the same level of knowledge as an attorney, and, therefore, additional notice may be appropriate." *Pierce v. City of Miami*, 176 F. App'x 12, 14 (11th Cir. 2006). We'll therefore consider the arguments the Plaintiff made in his Response. What we won't consider, however, is the sur-reply he filed without permission. *See* Sur-Reply [ECF No. 34]; *see also* S.D. FLA. 7.1(c)(1) ("No further or additional memoranda of law"—beyond the motion, response, or reply—"shall be filed and served without prior leave of Court.").

issues in the administrative record, "unless the administrator's decision was wrong, or arbitrary and capricious, these [factual] issues will not preclude summary judgment as they normally would." *Miller v. PNC Fin. Servs. Grp., Inc.*, 278 F. Supp. 3d 1333, 1341 (S.D. Fla. 2017) (cleaned up); *see also Hopp v. Aetna Life Ins. Co.*, 3 F. Supp. 3d 1335, 1339 (M.D. Fla. 2014) ("Conflicting evidence on the question of disability alone cannot create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may be reasonable.").

ERISA permits a plan participant or beneficiary to bring a civil action to recover benefits that are due under the terms of the plan or to enforce or clarify rights under the plan. *See* 29 U.S.C. § 1132(a)(1)(B). But "ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). In *Firestone Tire*, the Supreme Court held that, when a plaintiff challenges a denial of benefits under § 1132(a)(1)(B), the district court reviews the administrator's decision "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.

Since *Firestone*, the Eleventh Circuit has developed a multi-step framework for analyzing an administrator's benefits determination:

1. Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision in fact is "*de novo* wrong," then determine whether the administrator was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (cleaned up).

Under this framework, if the administrator has discretionary authority, the court can skip to step three, where it must determine, *not* whether the decision was right or wrong, but only whether it was arbitrary and capricious. *See Mickell v. Bell / Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 591 (11th Cir. 2020) (citing *Doyle v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1352, 1357 (11th Cir. 2008)); *see also Whiteside v. Securian Life Ins. Co.*, 2017 WL 8897132, at *4 (M.D. Fla. Dec. 7, 2017) ("[T]he undersigned will begin the analysis at step three of the Eleventh Circuit's framework because . . . the dispositive question is whether [the decision] was arbitrary and capricious." (quoting *Prelutsky v. Greater Ga. Life Ins. Co.*, 692 F. App'x. 969, 972 (11th Cir. 2017)).

The administrator's decision is "reasonable" (and, therefore, not "arbitrary or capricious") if it's supported by some "reliable evidence" in the record—and that's true *even if* the plaintiff's position is also reasonable. *See Pagnozzi v. JP Morgan Chase & Co.*, 2016 WL 2735677, at *9 (S.D. Fla. May 5, 2016); *see also Doyle*, 542 F.3d at 1363 (even if the "evidence is close," the administrator does not abuse its discretion by denying benefits).[7] This deference applies, not just to the administrator's assessment of the evidence in the administrative record, but also to its interpretation of the plan terms. *See White v. Coca-Cola Co.*, 542 F.3d 848, 857 (11th Cir. 2008) ("[T]he 'reasonable interpretation' factor and the arbitrary and capricious standard of review would have little meaning if ambiguous language in an

---

[7] In this context, the phrase "arbitrary and capricious" means "abuse of discretion." *Blankenship*, 644 F.3d at 1355 n.5 (quoting *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).

9

ERISA plan were construed against the plan administrator." (quoting *Cagle v. Bruner*, 112 F.3d 1510, 1519 (11th Cir. 1997))).

ANALYSIS

Because the Plaintiff doesn't disagree that the Policies confer Securian Life with discretionary authority, *see generally* Response, we skip to the third step of the *Blankenship* test and consider only whether Securian Life's decision to deny AD&D benefits was arbitrary and capricious, *see Pierce v. Wyndham Worldwide Operations, Inc.*, 791 F. App'x 45, 49 (11th Cir. 2019) (where "[t]he parties agree that the [ERISA plan] expressly grants [the administrator] the discretion to make medical necessity determinations[,] [t]he arbitrary and capricious standard is . . . appropriate").[8]

In determining whether Securian Life's decision was arbitrary and capricious, we are "limited to consideration of the material available to the administrator at the time it made its decision." *Crowder v. Delta Air Lines, Inc.*, 963 F.3d 1197, 1203 (11th Cir. 2020) (quoting *Blankenship*, 644 F.3d at 1354). The Plaintiff doesn't suggest that Securian Life failed to provide him (or the Court) with a complete administrative record. *See generally* Response; *see also Crowder*, 963 F.3d at 1203 n.3 (reviewing benefits denial based on the extant record when the claimant did "not contend that the district court rendered its decision on an incomplete record"). To the contrary, the Plaintiff has stipulated to the joint statement of material facts, *see* Joint SOMF at 1 n.1 ("The Parties have conferred on February 3, 2021, by telephone and e-mail, and agree to this Joint Statement of Undisputed Material Facts."), and he never contested Securian Life's separate statement of material facts, *see generally* Docket. Still, he does suggest that the record in *this* litigation has "not developed" properly because (he says) he hasn't had

---

[8] Nor could the Plaintiff have argued otherwise. The grant of discretionary authority is "apparent from the text of the [Policies]," *Pierce*, 791 F. App'x at 49, and is stated in "express language unambiguous in its design," *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994); *see also* Joint SOMF ¶ 6 (providing that "Securian Life has the exclusive right and authority, *in its sole discretion* to interpret the group policy and decide all matters arising thereunder" (emphasis added)).

the "opportunity to question the individual(s) who drafted the ambiguous language" or the "doctor who performed the postmortem." Response at 6.

We disagree. The Plaintiff had more than five months—between August 5, 2020 (when Securian Life first appeared in the case, *see* Answer [ECF No. 13]), and January 12, 2021 (when discovery closed, *see* Scheduling Order [ECF No. 20] at 2)—to take discovery in this case. And we can safely assume that this gave him plenty of time to depose the witnesses he wanted "to question" because he *never* moved either to compel discovery or to extend the scheduling order's deadlines. *See generally* Docket. Since Securian Life filed its Motion only *after* the close of discovery (on February 3, 2021), *see generally* Motion, the Plaintiff cannot complain about his own failure to take (or to compel) the depositions he only now claims to need. *See, e.g.*, *Herrera v. Bank of Am., N.A.*, 2016 WL 4542105, at *6 (S.D. Fla. Aug. 31, 2016) ("Plaintiff . . . never moved to compel better responses to the discovery, and the discovery deadline has now long passed. Accordingly, . . . Plaintiff has waived any right to assert these arguments on summary judgment."); *see also* S.D. FLA. L.R. 26.1(g)(1) (requiring that discovery disputes be presented to the Court by motion within 30 days and providing that "[f]ailure to present the dispute to the Court within that timeframe, absent a showing of good cause for the delay, may constitute a waiver of the relief sought at the Court's discretion"). He's thus waived any claim to additional evidence outside the administrative record.[9]

---

[9]      Waiver aside, the Plaintiff wouldn't have been entitled to the depositions he now asks for. Federal courts (it's true) have *some* discretion to permit limited discovery for evidence outside the administrative record—but they exercise that discretion only in narrow circumstances, usually when there are questions about the administrator's competency or conflicts of interest. *See, e.g.*, *Johnston v. Aetna Life Ins. Co.*, 282 F. Supp. 3d 1303, 1307–08 (S.D. Fla. 2017) (courts have discretion to permit discovery to assist in evaluating: "(1) the exact nature of the information considered by the fiduciary in making the decision; (2) whether the fiduciary was competent to evaluate the information in the administrative record; (3) how the fiduciary reached its decision; (4) whether, given the nature of the information in the record, it was incumbent upon the fiduciary to seek outside technical assistance in reaching a 'fair and full review' of the claim; and (5) to determine whether a conflict of interest existed." (quoting *Cerrito v. Liberty Life Assurance Co.*, 209 F.R.D. 663, 664 (M.D. Fla. 2002))).

We turn, then, to the question at hand: whether Securian Life's decision was arbitrary and capricious. In holding that it wasn't, we conclude, *first*, that Mr. Mocombe's death wasn't a covered loss under the Policies and, *second*, that the overdose was excluded by the plain terms of the Policies' exclusions.

## I.   COVERED LOSS

The Plaintiff bears the burden of proving that Mr. Mocombe's death was covered by the Policies. *See Garcon v. United Mut. of Omaha Ins. Co.*, 779 F. App'x 595, 599–600 (11th Cir. 2019) ("A plaintiff suing under ERISA bears the burden of proving his entitlement to contractual benefits[.]"). Here, the Policies provide AD&D benefits "only when [the insured's] loss, death or dismemberment, results, directly and independently from all other causes, from an accidental bodily injury which was unintended, unexpected and unforeseen." Joint SOMF ¶ 3. To qualify for these benefits, "[t]he bodily injury must be evidenced by a visible contusion or wound, except in the case of accidental drowning," and it "must be the sole cause of [the insured's] death or dismemberment." *Id.*

As we've explained, the Plaintiff claims that the *exclusion*'s use of the word "narcotic" is ambiguous. *See* Response at 4, 6. But he doesn't argue that the death was an "accidental bodily injury" or that a bodily injury—as evidenced by a visible contusion or wound—was the *sole* cause of Mr. Mocombe's death. *See generally id.* He's thus waived any argument that Mr. Mocombe's death was a

---

The Plaintiff doesn't explain why he would have been entitled to depose the policy drafters or the Medical Examiner. *See generally* Response. And, notably, the Plaintiff never claims that Securian Life operated under a conflict of interest or that it failed to conduct a diligent investigation. *See generally id.* Deposing the policy drafters therefore wouldn't assist the Plaintiff (or the Court) in any meaningful way—particularly because, as we explain below, Securian Life's interpretation of the Policies was reasonable. Nor does the Plaintiff describe what he would have asked the Medical Examiner, whom he refers to as "very competent." *Id.* at 5. And, for the reasons we outline below, Securian Life was entitled to rely on the Toxicology Report and the Medical Examiner's Report in reaching its decision. We therefore would have denied any motion to compel these depositions—even had the Plaintiff filed one. *See Blake v. Union Camp Int'l Paper*, 622 F. App'x 853, 856 (11th Cir. 2015) (holding that the district court did not abuse its discretion in denying additional discovery and limiting the record "to the evidence that the ERISA plan administrator had before it in making its decision regarding [the claimant's benefits]").

*covered* loss, *see, e.g., Messina v. City of Fort Lauderdale*, 2021 WL 2567709, at *18 (S.D. Fla. June 23, 2021) (Altman, J.) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." (quoting *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009))). And this failure is fatal to his case. *See Garcon*, 779 F. App'x 595 at 599–600 (explaining that *the plaintiff* bears the burden of showing "his entitlement to contractual benefits").

Admittedly, in his Complaint, the Plaintiff *did* claim that, because the Policies covered "accidental" death—and since the Certificate of Death characterized Mr. Mocombe's death as an "Accident"—Securian Life was obligated to pay the AD&D benefits. *See* Complaint at 5. Of course, the Plaintiff waived this argument by failing to advance it in his Response to the Motion for Summary Judgment. *See generally* Response; *see also Schwarz v. Bd. of Supervisors on behalf of Villages Cmty. Dev. Districts*, 672 F. App'x 981, 983 (11th Cir. 2017) ("We agree with the district court that Plaintiffs waived these claims by failing to address them in their summary judgment response."). And the argument would have failed anyway because Mr. Mocombe's autopsy revealed no "visible contusion or wound"—a prerequisite to coverage under the Policies, *see* Joint SOMF ¶ 3 ("The bodily injury must be evidenced by a visible contusion or wound, except in the case of accidental drowning."). That's really the end of the matter.

But, even had the Plaintiff made this argument—and even had Mr. Mocombe's body shown some visible wound or contusion—the Plaintiff's claim would still fail because Mr. Mocombe's death wasn't "accidental" within the meaning of the Policies. In defining the terms of an insurance contract, we look to the federal common law of ERISA. *See Hauser v. Life Gen. Sec. Ins. Co.*, 56 F.3d 1330, 1333 (11th Cir. 1995) ("[B]ecause ERISA does not contain a body of contract law to govern the

interpretation and enforcement of employee benefit plans, federal courts must fashion a federal common law to regulate such lawsuits." (cleaned up)).[10]

In interpreting the term "accidental" as it appears in AD&D policies, several federal courts have followed the First Circuit's analysis in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990). In that case, the decedent climbed over a railing on a bridge and either fell or jumped to his death. *Id.* at 1079–80. Although it was undisputed that the decedent had *intentionally* climbed the railing, the parties disagreed about whether he'd jumped or fallen off that railing. *Id.* at 1083. In rejecting the murky distinction between "accidental means" and "accidental results," the First Circuit developed a two-part test: *First*, a court must decide whether the insured subjectively expected his actions to cause death or serious injury. *Second*, if the court cannot determine the insured's subjective expectations, it must undergo an objective analysis, asking whether a reasonable person (with similar background and experience) would have expected injury or death in the circumstances. *Id.*[11] In *Wickman*, the death wasn't "accidental" because, even if the decedent hadn't intentionally

---

[10]      If our policy had a choice-of-law provision, we'd follow state law to interpret the contract language—provided it wouldn't be "unreasonable or fundamentally unfair" to do so. *See Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1149 (11th Cir. 2001); *see also Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016) ("In the Eleventh Circuit, we have . . . enforced choice-of-law provisions in ERISA contracts and used state law to interpret terms in the ERISA contract when the state law was not unreasonable or fundamentally unfair."). But the parties don't suggest that the Policies include any such choice-of-law provisions. *See generally* Motion; Response.
      We do note, though—as an aside—that the Policies were issued and delivered in Maryland and that they (several times) refer to Maryland law. *See generally* Policy 90327; Policy 90328. Under Maryland law, death from the intentional, non-medical ingestion of narcotics is *not* an accident for purposes of an AD&D policy. *See Gordon v. Metro. Life Ins. Co.*, 256 Md. 320, 324 (1970) ("When a man injects himself with a dangerous drug and no mishap occurs in the injection, though an unexpected result occurs, there is no reason to obliterate the distinction between means and results to insure that he can recover a double indemnity benefit. Perhaps in some cases there is no way to distinguish, but here with an intentional illegal act involving serious foreseeable risk, we are presented with cumulating evidence that this is not the type of hazard against which this policy provides.").
[11] The court described this objective inquiry as follows:

        If the fact-finder determines that the insured did not expect an injury similar in type
        or kind to that suffered, the fact-finder must then examine whether the suppositions

jumped off the bridge (step one: subjective inquiry), a reasonable person would have expected injury or death to result from the dangerous act of climbing the railing of an elevated bridge (step two: objective inquiry). *Id.* at 1088–89.

Although the Eleventh Circuit hasn't adopted *Wickman*, it has approved of the decision in *dictum. See Buce*, 247 F.3d at 1147 ("[W]e think that, in the case before it, the First Circuit was on eminently sound ground in ruling out 'accidental means' and focusing instead on the objectively reasonable expectations of a person in the perilous situation that the decedent had placed himself in."). And several district courts in this Circuit have applied *Wickman*'s two-part test in cases where (as here) the governing ERISA plan didn't contain a choice-of-law provision. *See, e.g., Dailey for Est. of Dailey v. Fed. Ins. Co.*, 2010 WL 11613916, at *14 (N.D. Ala. Mar. 1, 2010) ("Considering the trend among the circuits, and the Eleventh Circuit's statements in *Buce*, it is determined that the *Wickman* standard should be applied to the instant case."); *see also McClurg v. Hart Ford Life & Acc. Ins. Co.*, 2006

---

which underlay that expectation were reasonable. This analysis will prevent unrealistic expectations from undermining the purpose of accident insurance. If the fact-finder determines that the suppositions were unreasonable, then the injuries shall be deemed not accidental. The determination of what suppositions are unreasonable should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. . . .

Finally, if the fact-finder, in attempting to ascertain the insured's actual expectation, finds the evidence insufficient to accurately determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of the insured's expectations. In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct. An objective analysis, when the background and characteristics of the insured are taken into account, serves as a good proxy for actual expectation. Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured.

*Wickman*, 908 F.2d at 1088 (cleaned up).

WL 2801878, at *1 (M.D. Fla. Sept. 28, 2006); *Schreck v. Reliance Standard Life Ins.*, 104 F. Supp. 2d 1373, 1376 (S.D. Fla. 2000) (Jordan, J.).[12]

Applying *Wickman*, we conclude that Mr. Mocombe's death wasn't a covered accident. Notwithstanding the Plaintiff's unsubstantiated claim that Mr. Mocombe was "legally qualified to prescribe and administer" the drugs on which he overdosed, *see* Aug. 13, 2018 Letter,[13] *all* the record evidence establishes that Mr. Mocombe was *not* competent to prescribe or administer these drugs to himself. Recall that Securian Life investigated the Plaintiff's appeal and obtained evidence (1) that Mr. Mocombe wasn't authorized by Johns Hopkins to prescribe medications and hadn't obtained any medications from a Johns Hopkins facility between 2017 and 2018, and (2) that he wasn't prescribed any of the medications that were found in his system. *See* Joint SOMF ¶¶ 23–24. By all accounts, then, Mr. Mocombe was self-administering dangerous drugs without a prescription, without direction from a physician, and at great risk to his own life—making death not an "unintended, unexpected and unforeseen" result of his voluntary conduct. *Id.* ¶ 3. Recall, in this respect, the unrebutted opinion of Securian Life's Associate Medical Director: that ketamine (a general anesthetic) is a dangerous drug that should be administered *only* in a hospital setting under the care of a medical professional. *See* Def's SOMF ¶¶ 27–28. Recall, too, the undisputed medical literature, which places Mr. Mocombe's blood-alcohol level of .17%—even standing alone—just below the fatal range. *Id.* ¶ 26.

Given this uncontested medical evidence, Mr. Mocombe—a nurse anesthetist at Johns Hopkins, one of the finest hospitals in the world—very likely understood the extreme dangerousness of his conduct. But, even if he hadn't, we think it fair to say that a reasonable person in his shoes—

---

[12] *Wickman* has also been widely adopted outside our Circuit. *See Stamp v. Metro. Life Ins. Co.*, 531 F.3d 84, 89 (1st Cir. 2008) (collecting cases and noting that "[o]ur reasoning in *Wickman* has been widely accepted by our sister circuits").

[13] Note that, to his credit, the Plaintiff never offers this letter—or argues that his brother was authorized to self-prescribe these medications—in his Response. *See generally* Response.

16

given his extensive training and experience—would have known that injury or death could result from the act of ingesting enormous amounts of alcohol alongside a variegated cocktail of unprescribed medications, including and especially ketamine. And so, while it's true that the Medical Examiner called Mr. Mocombe's death an "accident," his death was not an "accidental bodily injury" within the meaning of the Policies because it was not "unintended, unexpected and unforeseen." Joint SOMF ¶ 3. For this reason, too, then, Mr. Mocombe's death was not a covered loss.

## II. POLICY EXCLUSIONS

Even if Mr. Mocombe's death *were* a covered loss under the Policies, Securian Life's decision to deny coverage under the Policies' *exclusions* was neither arbitrary nor capricious.

To recap: Mr. Mocombe was found dead with an IV in his hand and vials of (unprescribed) medications scattered throughout his apartment. *See id.* ¶ 7; *see also id.* ¶¶ 23–24 (noting that, based on a "ScriptCheck," the medications hadn't been prescribed and that, according to Johns Hopkins, Mr. Mocombe didn't have permission to write his own prescriptions). The Toxicology Report showed that Mr. Mocombe had a blood-alcohol level of .17% (which, according to Securian Life's Associate Medical Director, is just below the fatal level, *see* Def.'s SOMF ¶ 27), *and* high concentrations of diphenhydramine, ketamine, and fentanyl in his system, *see* Joint SOMF ¶ 14. The Medical Examiner concluded that diphenhydramine, ketamine, and ethanol intoxication (with fentanyl) caused Mr. Mocombe's death. *Id.* ¶¶ 12–13. And none of the reports—the Incident Report, the Medical Examiner's Report, or the Certificate of Death—pointed to *any other* cause of death. *Id.* ¶¶ 7–16.

We thus cannot say that Securian Life acted arbitrarily or capriciously in concluding that AD&D coverage was *excluded*. The Policies, after all, exclude AD&D benefits for death caused "directly or *indirectly* by, [or that] results in whole or *in part* from or during, or [where] there is *contribution* from": (1) the use of alcohol or prescription drugs, non-prescription drugs, illegal drugs, or medications (Policy 70327), or (2) "a loss to which a contributing cause was the insured's being

17

intoxicated or under the influence of any narcotic" (Policy 70328). *Id.* ¶¶ 4–5 (emphases added). And Securian Life plainly had "a reasonable basis," supported by "some reliable evidence," *Pagnozzi*, 2016 WL 2735677, at *9, to conclude that non-prescription drugs and alcohol caused (or, at the very least, contributed to) Mr. Mocombe's death. Again, the Plaintiff does not dispute that Mr. Mocombe had (very dangerous) concentrations of alcohol and drugs in his system at the time of death—nor does he offer *any other* potential cause of death, much less one supported by the record. *See generally* Response; *see also McClurg*, 2006 WL 2801878, at *2 (holding that an alcohol exclusion applied because the claimant "was intoxicated as defined by the Policy, as his blood alcohol content constituted prima facie evidence that he was under the influence of alcoholic beverages" (cleaned up)); *Whiteside v. Securian Life Ins. Co.*, 2017 WL 8897132, at *7 (M.D. Fla. Dec. 7, 2017) ("The autopsy report, toxicology results, and record evidence all establish that Decedent's use of alcohol, at a minimum, contributed to her [drowning]. Thus, Defendant's denial of Plaintiff's claim for AD&D benefits is reasonable, and not arbitrary and capricious.").

Against all this, the Plaintiff advances two arguments—both unavailing. *First*, he claims that the term "narcotic" in Policy 70328 is "ambiguous" since it *can* be interpreted as encompassing only "illegal street drugs." Response at 5. The implication is that, because Mr. Mocombe didn't overdose on a "street" drug (presumably something like heroin), he's not excluded from coverage. For starters, though, this argument doesn't apply to—and thus cannot undermine—Securian Life's decision with respect to Policy 70327, whose exclusions don't include the word "narcotic." *See generally* Policy 70327. In any event, nothing in Policy 70328 limits the term "narcotic" to the Plaintiff's "street" definition. To the contrary, Policy 70328 refers to "*any* narcotic," Joint SOMF ¶ 5 (emphasis added), which the Oxford English Dictionary defines broadly as "[a] drug which when swallowed, inhaled, or injected into the system induces drowsiness, stupor, or insensibility, according to its strength and the amount taken; *esp.* an opiate." OXFORD ENGLISH DICTIONARY (3d ed. 2007) (definition of "narcotic"). This

definition, notably, has *nothing* to do with the drug's presence on the "street"—whatever that means—
and everything to do with its effects on the human body. Note, too, the last phrase of the definition
("*esp.* an opiate"). Congress likewise includes opiates—and their progeny—in its definition of
"narcotic." 21 U.S.C. § 802(17) ("The term 'narcotic drug' means any of the following whether
produced directly or indirectly by extraction from substances of vegetable origin, or independently by
means of chemical synthesis, or by a combination of extraction and chemical synthesis: . . . Opium,
opiates, derivatives of opium and opiates, [*etc.*]"). The fentanyl that was found in Mr. Mocombe's
system was thus *both* an opioid and a narcotic. *See United States v. Pellmann*, 668 F.3d 918, 920 (7th Cir.
2012) (noting that fentanyl is a Schedule II narcotic under the Controlled Substances Act); UNITED
STATES    DRUG    ENFORCEMENT    AGENCY,    FACT    SHEETS;    FENTANYL,
https://www.dea.gov/factsheets/fentanyl (last visited Aug. 24, 2021) (defining Fentanyl as a "narcotic
(opioid)").

But here's the point: whatever ambiguity the Plaintiff might want us to read into the exclusion,
we think it clear that, given everything we've just said, Securian Life's interpretation of Policy 70328
as excluding death caused by fentanyl[14] is (at the very least) a reasonable one. *See White*, 542 F.3d at
857 (holding that, under arbitrary and capricious review, courts defer to an administrator's reasonable
interpretation of ambiguous plan terms). And that's enough to dispose of the Plaintiff's first argument.

*Second*, the Plaintiff challenges the Medical Examiner's decision to conduct a subclavian blood
test rather than a urine test. *See* Response at 5 (speculating that the physician would have conducted a
"UAC/BAC"—*i.e.*, urine—test had she known that the Toxicology Report would be used to resolve

---

[14] Remember: the Plaintiff concedes (or at least doesn't dispute) that fentanyl either caused or
contributed to Mr. Mocombe's death. *See generally* Response (not challenging Securian Life's assertion
that fentanyl contributed to Mr. Mocombe's death); *see also* Aug. 13, 2018 Letter (conceding that the
decedent "accidentally succumbed to a therapeutic use of medications" and that his "[d]eath was
caused by an accidental overdoes [*sic*] of a sleeping cocktail that [the decedent] had been prescribing
to himself for years").

an insurance claim). In saying so, however, the Plaintiff simply misreads the Toxicology Report, which *does* show that the examiner tested a sample of Mr. Mocombe's urine (in addition to his blood). *See* Toxicology Report [ECF No. 29-7]. Indeed, the Plaintiff appended that same Toxicology Report to his first appeal—in which he (notably) didn't take issue with the type of test the examiner administered and didn't contest the examiner's conclusion that Mr. Mocombe had died of an overdose. *See* Aug. 13, 2018 Letter (noting that the decedent "accidentally succumbed to a therapeutic use of medications" and that "[d]eath was caused by an accidental overdoes [*sic*] of a sleeping cocktail"). In any event, Securian Life was entitled to rely on the Toxicology Report—which, after all, was conducted by an independent Medical Examiner. *See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1193 (11th Cir. 2010) (holding that the administrator was entitled to rely on toxicology tests over the affidavit of an eye witness who attested that the decedent didn't appear to be intoxicated before the incident); *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002) (per curiam) (holding that a plan administrator is "entitled to rely on the opinion of the independent medical examiner").[15]

Notably, the Plaintiff never responds to Securian Life's invocation of the crime or felony exclusions, *see generally* Response—another fatal omission. Nor could he have. The Maryland Criminal Code lists fentanyl and ketamine—both found in the decedent's system, *see* Joint SOMF ¶¶ 11–16—

---

[15] *See also Stamp v. Metro. Life Ins. Co.*, 466 F. Supp. 2d 422, 426 (D.R.I. 2006) ("Because the blood alcohol level found by the Medical Examiner is unequivocal evidence of [the decedent's] intoxication at the time of death, the question of whether he stopped at a bar is not a material factual dispute, and the Court need not speculate as to its truth."); *Sawyer v. Potash Corp. of Saskatchewan (Potashcorp)*, 417 F. Supp. 2d 730, 741 (E.D.N.C. 2006) ("The court views it to be particularly relevant that plaintiff at no time submitted any evidence or argument for inclusion in the administrative record to contradict or contest [the administrator's] factual finding of intoxication."); *Veal v. Nationwide Life Ins. Co.*, 2010 WL 1380170, at *3 (N.D. Fla. Mar. 31, 2010) (deferring to a toxicology report despite the plaintiff's unspecified objections); *cf. Cornish v. U.S. Life Ins. Co. of City of N.Y.*, 2009 WL 3231351, at *13 (W.D. Ky. Sept. 30, 2009) (declining to consider evidence not provided to the plan administrator regarding the reliability of post-mortem blood-alcohol testing).

as "Schedule II controlled dangerous substances," MD. CODE ANN., CRIM. LAW §§ 5-403(a)(3), 5-403(c)(9), 5-404(f)(2) (West 2021); and it makes it a misdemeanor to possess those substances, unless they're prescribed by an authorized provider, *see id.* § 5-601(a)(1), (c). That's enough for us to conclude—especially under ERISA's deferential standard of review—that Securian Life's decision to exclude coverage under Policy 70327 wasn't arbitrary or capricious. *See* Joint SOMF ¶ 4 (noting that Policy 70327 excludes death that "results in whole or in part from or during . . . [the insured's] participation in, or attempt to commit, a crime, assault, felony, or any illegal activity, regardless of any legal proceedings").[16]

### III.    REMAINING ISSUES

Securian Life argues that Securian Financial isn't a proper party to this lawsuit because it didn't administer the Policies or make any of the benefits determinations. *See* Motion at 16. The Plaintiff doesn't address this argument either—nor does he contend that Securian Financial was somehow involved in the Policies' administration. *See generally* Response. For this additional reason, then, we enter judgment in favor of Securian Financial. *See Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997) ("The proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan.").[17]

*** 

After careful review, the Court hereby **ORDERS AND ADJUDGES** as follows:

---

[16] We're less persuaded by Securian Life's invocation of the Policy 70328 exclusion, which is expressly limited to felonies. *See* Joint SOMF ¶ 5 (Policy 70328 excludes death that "results in whole or in part from or during, or [where] there is contribution from . . . the insured's commission of, or attempt to commit a felony, or to which a contributing cause was [the insured's] being engaged in an illegal occupation"). According to Securian Life, it's a felony in Maryland to engage in prescription fraud. *See* Motion at 14 (citing MD. CODE ANN., CRIM. LAW §§ 5-606, 5-607 (West 2021)). But Securian Life doesn't point to—and there doesn't seem to be—any evidence that Mr. Mocombe engaged in prescription fraud.

[17] Securian Life also contends that it's entitled to judgment because the Plaintiff failed to join Mr. Lefevre, the co-primary beneficiary and (according to Securian Life) an "indispensable party." Motion at 15–16. But, since we've granted Securian Life's Motion on other grounds, we needn't address this alternative argument here.

1. Securian Life's Motion [ECF No. 30] is **GRANTED**.

2. Pursuant to FED. R. CIV. P. 58, the Court will enter final judgment separately.

3. The Clerk of Court shall **CLOSE** this case.

4. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELLED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 31st day of August 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     Rony Y. Jean Baptiste, *pro se*
        counsel of record